**SILLS CUMMIS & GROSS P.C.**
S. Jason Teele, Esq.
Daniel J. Harris, Esq.
101 Park Avenue, 28th Floor
New York, New York 10178
(212) 643-7000 (Telephone)
(212) 643-6500 (Facsimile)

*Proposed Counsel to the Debtor*
*and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| OCCASION BRANDS, LLC[1] | Case No. 20-11684 (SMB) |
| Debtor. | |

## DECLARATION IN SUPPORT OF CHAPTER 11
## PETITION AND FIRST DAY PLEADINGS

I, David Wilkenfeld, hereby declare under penalty of perjury as follows:

1.      I am the Chief Executive Officer of Occasion Brands, LLC (the "**Debtor**").  I am familiar with the day-to-day operations, affairs, and books and records of the Debtor.

2.      On the date hereof (the "**Petition Date**"), the Debtor filed a voluntary petition under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in this Court.

3.      The Debtor is currently operating its businesses and managing its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no request has been made for the appointment of a trustee or examiner.  No official committee of unsecured creditors has been appointed.

4.      On the date hereof or shortly thereafter, the Debtor intends to file a number of

---

[1]      The last four digits of the Debtor's federal tax identification number is 3434.  The location of the Debtor's service address is: 105 Sleepy Hollow Drive, Middletown, Delaware 19709.

7340845

motions and applications (collectively, the "**First Day Motions**") in order to allow the Debtor to operate while under the protection of this Court with minimum disruption or loss of value. I am familiar with the contents of the First Day Motions, and believe the relief sought in each such motion is necessary to ensure that the value of the Debtor's estate is maximized.

5.      I submit this declaration in support of the First Day Motions pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "**Local Rules**") and 28 U.S.C. § 1746 (the "**First Day Declaration**"). Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based on my personal knowledge, information supplied to me by the Debtor and its professionals, were learned from my review of relevant documents or are my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtor. If called upon to testify, I could and would testify competently to the facts set forth herein.

6.      Part I of this Declaration describes the background and business of the Debtor. Part II describes the Debtor's prepetition capital structure and indebtedness. Part III describes the circumstances leading to the commencement of the chapter 11 case. Part IV sets forth the relevant facts in support of each of the First Day Motions. Part V contains statements and additional information about the Debtor, as required by Local Rule 1007-2.

## PART I:
## BACKGROUND AND BUSINESS OF THE DEBTOR

7.      Founded in 1998, the Debtor is a family of e-commerce websites that focuses on prom, homecoming, bridal and other special occasion events. The Debtor is the largest pure-play e-commerce platform for prom dresses, and operates its business through three web properties: promgirl.com, simplydresses.com, and KleinfeldBridalParty.com. The Debtor's business

7340845

focuses on the marketing and sale of dresses and accessories for teen events.  The largest part of the Debtor's business covers prom, but also includes other events such as homecoming, sweet sixteen, graduation, and other special events.  The Debtor's business generated gross revenue in 2018 and 2019 in excess of $50,000,000 per annum, with the primary driver of revenue being promgirl.com.

8.    In early 2017, the Debtor expanded its business to cover the bridesmaid and wedding dress categories.  To that end, on February 3, 2017, the Debtor entered into an exclusive license (the "**License**") to sell dresses offered by Kleinfeld Bridal Corp. ("**Kleinfeld**") throughout North America online through its e-commerce platform.  Under the License, the Debtor was granted an exclusive license to utilize the trademark "Kleinfeld" in connection with its business.  Following execution of the License in 2017, the Debtor incurred sizeable startup costs of approximately $5 million related to the Kleinfeld's business, including costs relating to product development, technology and website infrastructure, inventory, and marketing.  The Debtor also expended resources leasing space at Kleinfeld's Manhattan location for the marketing and sale of Kleinfeld bridesmaid dresses through the Debtor's online platforms.  The License and recent developments with Kleinfeld is discussed in further detail below.

9.    The Debtor is headquartered in midtown Manhattan and has a Kleinfeld Bridal Party showroom located at Kleinfeld in Manhattan.  The Debtor also has back office operations located in Middletown, Delaware.  As of the Petition Date, the Debtor employs approximately twenty-one (21) individuals on a reduced schedule, with forty-nine (49) individuals (including the twenty-one (21) noted above) furloughed due to the current global pandemic.  The Debtor hopes to be able to rehire certain of the furloughed employees during the Chapter 11 Case.

7340845

## PART II:
## THE DEBTOR'S PREPETITION CAPITAL STRUCTURE AND INDEBTEDNESS

**(i)**      **Secured Promissory Notes**

10.      On November 19, 2019, the Debtor issued secured promissory notes due November 19, 2021 (the "**Secured Notes**") with Milestone Partners IV AIV, L.P., Milestone Partners IV, L.P. 2, Milestone Partners IV AIV, LP 3 (together with Milestone Partners IV AIV L.P. and Milestone Partners IV, L.P. 2, the "**Milestone Noteholders**"), and David Wilkenfeld (together with the Milestone Noteholders, the "**Secured Noteholders**"). The secured promissory note issued to Milestone Partners IV AIV, L.P. is for $554,032.50; the secured promissory note issued to Milestone Partners IV, L.P. 2 is for $191,430.00; and the secured promissory note issued to Milestone Partners IV AIV, LP 3 is for $4,537.50. The secured promissory note issued to David Wilkenfeld is for $750.000.00. Interest on the Secured Notes is payable quarterly in arrears on the first day of each quarter, commencing on March 1, 2020. As of the Petition Date, the Debtor calculates that the total indebtedness owed to the Secured Noteholders is not less than approximately $1,500,000.00.

11.      In connection with the issuance of the Secured Notes, the Debtor executed that certain Security Agreement dated as of November 18, 2019 (as may be amended, restated, supplemented or otherwise modified from time to time, the "**Security Agreement**") in favor of the Collateral Agent (as defined in the Security Agreement) for the benefit of the Secured Noteholders. The Secured Notes are secured by all present and future assets of the Debtor, wherever located, together with all proceeds and products thereof.

**(ii)**      **Allure Promissory Note**

12.      On March 30, 2018, the Debtor entered into that certain *Kleinfeld Joint Venture Agreement* (the "**Kleinfeld Joint Venture Agreement**") with American Clothing Express, Inc.

-4-

("**ACE**") pursuant to which the parties thereto entered into a joint venture relationship to supply Bridal Party Products (as defined in the Kleinfeld Joint Venture Agreement) with the intent to share Net Profits (as defined in the Kleinfeld Joint Venture Agreement) based on the sale of such products.   In connection with the termination of the Kleinfeld Joint Venture Agreement with ACE, the Debtor executed a promissory note dated December 31, 2019 (the "**Allure Promissory Note**") in the amount of $2,459,607.28.  The term of the Allure Promissory is twenty-four (24) months with payments due monthly in the amount of $102,483.64.  The Debtor made payments on the Allure Promissory Note to ACE in January and February 2020; however, ACE served the Debtor with a notice of acceleration due to non-payment in March 2020.  As of the Petition Date, the Debtor calculates that the total indebtedness owed under the Allure Promissory Note is not less than approximately $2,254,640.00.

13.     ACE was granted a security interest in all "Allure Products" (as defined in the Kleinfeld Joint Venture Agreement) as security for the repayment of the Allure Promissory Note. ACE and the Secured Noteholders executed a *Limited Subordination Agreement* dated December 31, 2019 that provided ACE with a first priority security interest in the Allure Products.

14.     On July 22, 2020, ACE commenced a lawsuit against the Debtor titled *American Clothing Express, Inc. v. Occasion Brands, LLC* in the Chancery Court of Tennessee For the Thirtieth Judicial District at Memphis asserting counts for (a) foreclosure, (b) breach of contract, and (c) injunctive relief.

**(iii)     Unsecured Obligations**

15.     The Debtor also has unsecured obligations to various other creditors, including ordinary trade creditors and vendors and an unsecured loan from JP Morgan Chase, N.A. in connection with the Paycheck Protection Program.   The Debtor estimates that it has

7340845

approximately $11,500,000.00 in outstanding unsecured obligations.

> **(iv)    The Debtor's Membership Interests**

16.      The Debtor is a limited liability company, organized under the laws of Delaware.

The Debtor is owned: (i) 75.94% by DMW Dresses, LLC and (ii) 24.06% by Milestone PG

Investment, LLC.

**PART III:
CIRCUMSTANCES LEADING TO THE COMMENCEMENT
OF THE CHAPTER 11 CASE**

17.      As noted above, the Debtor was formed in 1998 and operates a long-standing e-commerce occasion business that historically focused on the prom, homecoming, and other special event categories.  In early 2017, the Debtor elected to expand its bridal offerings and used the opportunity to enter into the License with Kleinfeld for the use of the "Kleinfeld" brand in connection with its business.  The License opportunity with Kleinfeld required significant upfront investment by the Debtor between 2017 and 2019 that resulted in significant year-over-year growth in Kleinfeld sales.

18.      The Debtor began to experience certain headwinds in 2019.  Due to market conditions, the Debtor's primary business, PromGirl and Simply Dresses, enacted a free return policy in 2019, which caused an unexpected significant increase in the Debtor's return rate and its cost of revenue.  At the same time, customer acquisition costs increased due to the competitive landscape for digital advertising.  To counter these headwinds and in an effort to increase efficiency, the Debtor updated its customer return policy and acquisition programs for the 2020 season.  The Debtor also worked with certain of its vendors in late 2019 and early 2020 to catch up on past due payments, and intended to use its cash flow from the spring 2020 prom season to pay vendors.

7340845

19.     Despite a strong start to 2020, on March 11, 2020, the World Health Organization officially declared COVID-19 a pandemic.  In response, national, state, and local governments in the United States, and around the world, imposed shelter-in-place and stay-at-home orders, as well as social distancing protocols.  As a result of the pandemic, the American retail industry and occasion businesses were ground to a halt.  The timing of the pandemic and response thereto came at the worst time for the Debtor—right in the middle of its key March and April selling season for prom and bridal dresses.  Beginning in mid-March, the Debtor experienced a catastrophic sales decline of approximately 90% as compared to the 2019 selling season.  Notably, the prom season accounts for approximately 70% of the Debtor's overall annual sales.  In addition, the pandemic caused customer returns on preexisting orders to skyrocket due to the cancellation of special events.  This forced the Debtor to have excessive refunds in excess of that which is anticipated the normal course of business.

20.     The pandemic also destroyed the Debtor's growth strategy associated with the Kleinfeld aspect of the business.  As noted above, the Debtor spent a significant amount of time and expense building out the bridal business around the License, including the design and build out of the KleinfeldBridalParty.com website, conducting extensive marketing, designing and stocking of inventory, and sub-leasing showroom space from Kleinfeld.  The Debtor expected the business trajectory, which was growing year-over-year, to accelerate in 2020 and beyond.  However, the pandemic and resulting shutdown caused the Kleinfeld store, including the Debtor's sub-leased showroom space therein, to close.  The pandemic also negated the Debtor's 2020 marketing efforts and caused the cancellation of critical bridal shows.  In short, the pandemic stymied any opportunity for the Debtor to maximize the value of the License.  As a result, the Debtor fell behind on payments due to Kleinfeld on the License, and on July 10, 2020,

-7-

Kleinfeld sent the Debtor a notice of default (the "**Notice of Default**") indicating that the Debtor was in default of its obligations to make payments on April 1, 2020 and July 1, 2020. The Debtor reserves all of its rights with respect to the License and the Notice of Default.

21.     Among other operational changes, the Debtor intends to use this Chapter 11 Case to exit the Kleinfeld's business described above. To that end, the Debtor intends to sell its interest in the License and related assets. Separately, the Debtor intends to pursue a sale of all of its non-Kleinfeld related assets pursuant to a section 363 sale, subject to certain milestones set forth in the Debtor's motion to approve the use of cash collateral. The Debtor anticipates filing a motion to establish bidding procedures and approve a sale within the first thirty (30) days of the Chapter 11 Case.

22.     On July 21, 2020, the Debtor's Board of Managers (a) retained Insight Partners, LLC ("**Insight**") to provide the Debtor with a Chief Restructuring Officer (the "**CRO**"), (b) designated Robert Nolan of Insight as the CRO, and (c) appointed Mr. Nolan to act as the Debtor's independent manager to assist with the Chapter 11 process.

## PART IV:
## FIRST DAY MOTIONS AND APPLICATIONS

23.     The Debtor has filed or will file the First Day Motions, seeking various forms of relief designed to maximize the value of its estate for the benefit of creditors and other stakeholders. I have reviewed each of the First Day Motions and believe that the Debtor has satisfied the applicable standards for the relief requested, and that the Court's grant of the requested relief is in the best interests of the Debtor, its estate, as well as that of its creditors and other parties in interest. Each of the First Day Motions is summarized below.

24.     **Cash Management Motion**. The Debtor seeks entry of an order authorizing the Debtor to (i) continue and maintain their existing cash management system and bank accounts,

7340845

and (ii) continue using their existing business forms, checks and records.

25.    To facilitate the efficient operation of its business, in the ordinary course of business, the Debtor utilizes an integrated, centralized cash management system to collect, transfer and disburse funds generated by their operations (the "**Cash Management System**"). The Cash Management System facilitates the Debtor's cash forecasting and reporting, monitoring the collection and disbursement of funds, maintenance of current and accurate accounting records for all cash transactions.  As of the Petition Date, the Debtor maintains five (5) bank accounts (the "**Bank Accounts**") at JPMorgan Chase Bank, N.A. (account numbers 1180, 6789, 6797, 6805, and 1230).  The Debtor also maintains three (3) accounts with PayPal that each hold less than $10,000 for customer refunds.  Any amounts in the PayPal accounts in excess of $10,000 will be swept into the Bank Accounts on a daily basis.

26.    The Cash Management System is similar to those commonly employed by businesses comparable to the Debtor in economic scope and geographic reach.  Indeed, large, complex businesses use such systems because of the numerous benefits provided, including the ability to quickly and easily locate and trace funds, which allows the Debtor to control corporate funds, ensure cash availability to the Debtor, and reduce administrative expenses by facilitating the movement of funds. Any disruption of the Cash Management System would be extremely detrimental to the Debtor's operations.

27.    I believe that the relief requested in the Cash Management Motion is in the best interest of the Debtor's estates, their creditors, and all other parties in interest, and will enable the Debtor to continue to operate in the ordinary course without disruption.  Accordingly, on behalf of the Debtor, I respectfully submit that the Court should approve the Cash Management Motion.

28.    **Utilities Motion**.  The Debtor seeks entry of interim and final orders (a)

-9-

7340845

prohibiting utility providers from altering, refusing or discontinuing services, (b) determining adequate assurance of payment for future utility services, (c) establishing procedures for determining adequate assurance of payment for future utility service, and (d) granting related relief.

29.    In the ordinary course of business, the Debtor obtains gas, telecommunications and other services from approximately six (6) utility providers (the "**Utility Providers**").  A list of the Utility Providers and corresponding accounts is attached to the Utilities Motion. The Debtor pays approximately $18,000.00 each month for utility services, calculated as a historical average payment for a twelve-month period.  The Debtor does not have any deposits or prepayment with respect to any Utility Provider.

30.    Uninterrupted utility services are essential to the Debtor's ongoing operations.  If the Utility Providers refuse or discontinue service, even for a brief period, the Debtor's business operations will be severely disrupted.  The impact on the Debtor's business operations, customer relationships, revenue and profits will be extremely harmful and will jeopardize the Debtor's efforts to maximize the value of its estate.

31.    The Debtor intends to pay the postpetition obligations owed to the Utility Providers in a timely manner in the ordinary course of business.  Cash held by the Debtor, the cash generated in the ordinary course of business will provide sufficient liquidity to pay the Debtor's utility service obligations in accordance with prepetition practice.  To provide additional assurance of payment, the Debtor proposes to deposit into a segregated account $9,000.00 (the "**Adequate Assurance Deposit**"), which represents an amount equal to approximately two weeks of all of the Debtor's utility services.  The Adequate Assurance Deposit will be held in the segregated account for the duration of this chapter 11 case to be

7340845

applied to any postpetition defaults in payment to the Utility Providers. I believe that the Adequate Assurance Deposit, in conjunction with the Debtor's ability to pay for future utility services in accordance with prepetition practice, provides more than adequate assurance of payment to the Utility Providers.

32.    I believe that the relief requested in the Utilities Motion is necessary to avoid immediate and irreparable harm, is in the best interests of the Debtor's estate, their creditors and all other parties in interest, and will enable the Debtor to continue to operate in the ordinary course without disruption. Accordingly, on behalf of the Debtor, I respectfully submit that the Court should grant the Utilities Motion.

33.    **Schedules Extension Motion**. The Debtor seeks entry of an order (a) extending the deadline by which the Debtor must file its schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs by thirty (30) days, for a total of forty-four (44) days after the Petition Date, without prejudice to the Debtor's right to request additional extensions.

34.    I believe that the relief requested in the Schedules Extension Motion is appropriate because it (a) will not prejudice or adversely affect the rights of any creditor or other party in interest and (b) will relieve the Debtor of an administrative burden. The Debtor's focus should be on seamlessly transitioning into chapter 11 and maximizing the value of its estate.

35.    **Wage and Benefits Motion**. The Debtor seeks authorization to (i) pay all pre-petition employee claims for wages, salaries and other accrued compensation; (ii) make all payments for which employee payroll deductions were withheld prepetition; (iii) reimburse all prepetition employee business and other expenses; (iv) make prepetition contributions and pay benefits under certain employee benefit plans; (v) pay other miscellaneous employee-related

costs including processing costs and fees; and (vi) continue certain health, welfare and benefit programs (collectively, the "**Employee Obligations**").

36.     As of the Petition Date, the Debtor believes it are current with respect to their employee wages.  However, out of an abundance of caution, it requests authority to pay such wages, along with any other prepetition Employee Obligations, in an amount not to exceed the statutory cap of $13,650 per employee.

37.     I believe the relief requested in the Wage and Benefits Motion is warranted.  In short, any delay in honoring the Employee Obligations could severely disrupt the Debtor's relationships with their employees and irreparably impair the employees' morale at the very time that their dedication, confidence and cooperation are most critical.  The Debtor faces the risk that their operations may be severely impaired if the relief requested in this Motion is not granted.  At this critical stage, the Debtor simply cannot risk the substantial disruption of its business operations that would attend any decline in workforce morale attributable to the Debtor's failure to pay the Employee Obligations in the ordinary course of business during the pendency of this Chapter 11 Case.  Accordingly, on behalf of the Debtor, I respectfully submit that the Court should grant the Wage and Benefits Motion.

38.     **Warehousing Charges Motion**.  The Debtor seeks entry of interim and final orders authorizing the Debtor to honor outstanding invoices related to services provided by the Debtor's third-party Warehouse.  While the Debtor's businesses operate online, all of the Debtor's products are held in and distributed by the Warehouse located in New Jersey.  The Warehouse is singularly responsible for all customer order matching, pick and pack operations, and distribution to customers.  The Warehouse also receives merchandise and customer returns, and stores all of the Debtor's inventory.  The Debtor pays the Warehouse approximately

-12-

$15,000.00 per week for storage and other fees.

39.     Maintaining the regular flow of inventory and other products is central to the Debtor's ability to operating in the ordinary course of business.  In the event that the Debtor fails to reimburse the Warehouse for charges incurred in connection with the storage and distribution of inventory and other products, various state laws may permit the Warehouse to assert statutory liens against the inventory and other products in its possession that is the subject of any delinquent charges, securing such charges and potentially blocking the Debtor's access to the merchandise.

40.     Thus, to maintain access to inventory and other products that is essential to the continued viability of the Debtor's operations and preserve the value of the inventory. Accordingly, on behalf of the Debtor, I respectfully submit that the Court should grant the Warehouse Charges Motion.

41.     **Customer Credits Motion**.  The Debtor seeks entry of interim and final orders authorizing, but not directing the Debtor to honor prepetition customer credits.

42.     In the ordinary course of business, the Debtor honors return, refund, and exchanges from their customers when the customer determines that it does not want to keep the merchandise.  Consistent with industry practice, in the event that merchandise is returned and the customer is not eligible for a cash refund (i.e., due to special order of sale item), the Debtor maintains a policy that allows customers to receive store credit for future purchases.  As of the Petition Date, the Debtor believes it owes customers approximately $2,688,400.00 for customer credits.

43.     Continuing to administer and recognize the Customer Credits without interruption during the pendency of this Chapter 11 Case will help preserve the Debtor's valuable customer

-13-

relationship and goodwill, which will inure to the benefit of all of the Debtor's stakeholders and its estate. Accordingly, on behalf of the Debtor, I respectfully submit that the Court should grant the Customer Credits Motion.

44.    **Cash Collateral Motion**. As of the Petition Date, the Debtor requires access to the use of cash collateral to fund its business operations. Without the use of cash collateral, the Debtor will not have sufficient liquidity to continue to fund its operations, fund employee payroll and benefits obligations, pay vendors of necessary goods and services, and satisfy other operational requirements during this Chapter 11 Case. I believe that obtaining continued use of cash collateral as requested by the Debtor in the Cash Collateral Motion is essential to the Debtor's ability to continue its operations without interruption and maximize value of its estate for the benefit of all stakeholders.

45.    Accordingly, the Debtor requests the entry of interim and final orders granting (i) the Debtor's use of cash collateral, (ii) liens on and security interests in the prepetition and postpetition assets of the Debtor, (iii) adequate protection to the extent of any diminution in the value of the collateral as a result of the Chapter 11 Case, and (iv) related relief. The Cash Collateral order is the product of arms-length negotiations, is fair and reasonable under the circumstances, and is in the best interests of the Debtor, its estate, and all parties in interest.

## PART V:
## LOCAL RULE 1007-2 DISCLOSURES

46.    Local Rule 1007-2(a)(1): A statement regarding the nature of the Debtor's businesses and the circumstances leading to the filing of the chapter 11 case is set forth above.

47.    Local Rule 1007-2(a)(2): Not applicable because the chapter 11 case was not originally commenced under chapter 7 or chapter 13 of the Bankruptcy Code.

48.    Local Rule 1007-2(a)(3): Not applicable because no committee was organized

-14-

before the Petition Date.

49.    Local Rule 1007-2(a)(4):   The chapter 11 petition lists the twenty (20) largest

unsecured claims, excluding the claims of insiders, against the Debtor as of the Petition Date and

includes, to the extent such information is available, the creditor's name, address (including the

number, street, apartment or suite number, and zip code, if not included in the post office

address), telephone number, e-mail address, the name(s) of person(s) familiar with the Debtor's

accounts, and the amount of the claim.[2]  The Debtor reserves any and all rights (i) as to whether

any claim is contingent, unliquidated, disputed or subject to setoff, (ii) to challenge the priority,

nature, amount and status of any claim or debt, and (iii) to assert any remedies, defenses,

counterclaims and offsets with respect to each of the foregoing.

50.    Local Rule 1007-2(a)(5): **Exhibit 1** lists the five (5) largest secured claims against

the Debtor as of the Petition Date and includes, to the extent such information is available, the

creditor's name, address (including the number, street, apartment or suite number, and zip code,

if not included in the post office address), the amount of the claim,[3] and a brief description and

an estimate of the value of the collateral securing the claim. The Debtor reserves any and all

rights: (i) as to the validity, enforceability and priority of each claim and lien, and (ii) to assert

remedies, defenses, counterclaims and offsets with respect to such claim.

51.    Local Rule 1007-2(a)(6), **Exhibit 2** provides a summary of the Debtor's assets

and liabilities.

52.    Local Rule 1007-2(a)(7): Not applicable because the Debtor does not have any

classes of publicly held stock, debentures or other securities.

---

[2]    The amounts listed represent the Debtor's best estimate of the amounts of such claims and are subject to verification.

[3]    The amounts listed represent the Debtor's best estimate of the amounts of such claims and are subject to verification.

7340845

53.     Local Rule 1007-2(a)(8): Not applicable because none of the Debtor's property is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity.

54.     Local Rule 1007-2(a)(9): **Exhibit 3** lists the premises owned, leased or held under another arrangement from which the Debtor operates its business.

55.     Local Rule 1007-2(a)(10): **Exhibit 4** lists the location of the Debtor's substantial assets, the location of their books and records, and the nature, location and value of any assets held by the Debtor outside the territorial limits of the United States.

56.     Local Rule 1007-2(a)(11): **Exhibit 5** lists the nature and present status of each action or proceeding, pending or threatened against the debtor or its property where a judgment against the Debtor or seizure of the Debtor's properties may be imminent as of the Petition Date.

57.     Local Rule 1007-2(a)(12): **Exhibit 6** lists the Debtor's existing senior management, their tenure with the Debtor, and a brief summary of their relevant responsibilities and experience.

58.     Local Rule 1007-2(b): The Debtor intends to continue operating their businesses.

59.     Local Rule 1007-2(b)(1): The Debtor estimate that the weekly payroll for employees (exclusive of officers, directors, stockholders and partners) during the thirty (30) day period following the Petition Date will be approximately $25,000.00.

60.     Local Rule 1007-2(b)(2): The Debtor estimates that the amount to be paid to the their officers and directors for the thirty (30) day period following the Petition Date will be $40,000.00, and that the amount to be paid to their financial and business consultants for the thirty (30) day period following the Petition Date will be $6,800.00.

61.     Local Rule 1007-2(b)(3): Not applicable because the Debtor does not anticipate

7340845

receiving any receipts or receivables within the thirty (30) day period following the Petition Date.

62.    I am advised that venue of the Chapter 11 Case in this District is proper because the Occasion Brands, LLC headquarters is located in this district at 1441 Broadway, 29th Floor, New York, New York 10018.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: July 22, 2020                           /s/ David Wilkenfeld_____
                                               David Wilkenfeld
                                               Chief Executive Officer

-17-

7340845

**EXHIBIT 1**
**5 Largest Secured Claims**

| Creditor | Amount of Claim | Description of Claim | Value of Collateral Securing Claim | Lien or Claim Disputed (Y/N) |
|---|---|---|---|---|
| American Clothing Express, Inc. | $2,254,640.00 | Promissory Note | TBD | N |
| David Wilkenfeld | $750,000.00 | Secured Promissory Note | TBD | N |
| Milestone Partners AIV, L.P. | $554.032.50 | Secured Promissory Note | TBD | N |
| Milestone Partners IV, L.P. 2 | $191,430.00 | Secured Promissory Note | TBD | N |
| Milestone Partners IV AIV, LP 3 | $4,537.50 | Secured Promissory Note | TBD | N |

7340845

## EXHIBIT 2
### Summary of Assets and Liabilities

**Occasion Brands, LLC**
**Estimated Assets & Liabilities**
**July 15, 2020**

| Assets | | | Liabilities | | |
|---|---:|---|---|---:|---|
| Cash - Paypal balance | 12,000 | | Accounts payable | 10,299,041 | |
| Cash - checking | 65,763 | | Accrued expenses | 424,200 | |
| Cash - PPP | 778,709 | | Loan payable - members | 1,500,000 | |
| Total Cash | 856,472 | | Loan payable - Allure | 2,254,640 | |
| | | | Loan payable - PPP | 1,325,000 | 2 |
| Restricted cash | 203,110 | 1 | Customer returns credit | 2,688,400 | |
| | | | Deferred rent | 220,300 | |
| Credit card receivables | 20,000 | | | | |
| | | | | | |
| Gross inventory | 7,000,000 | | | | |
| Inventory reserve | (247,427) | | | | |
| Net inventory | 6,752,573 | | | | |
| | | | | | |
| Prepaid sales tax | 176,000 | | | | |
| Prepaid expenses | 489,900 | | | | |
| Property & equipment (net) | 142,650 | | | | |
| Security deposits | 45,100 | | | | |
| | | | | | |
| **Total Assets** | **8,685,804** | | **Total Liabilities** | **18,711,581** | |

1. Interest bearing account securing L/C for rental lease security deposit.

2. PPP loan pending partial to full forgiveness.

7340845

**EXHIBIT 3**
**Leased Premises**

| Locations | Landlord |
|---|---|
| 1441 Broadway<br>New York, New York 10018 | Lechar Realty Corp.<br>1441 Broadway<br>New York, New York 10018 |
| 105 Sleepy Hollow Drive<br>Middletown, Delaware 19709 | BFB Investments, L.L.C.<br>502 Brier Avenue<br>Greenbrier Apartments<br>Wilmington, Delaware 19805 |
| 111 West 19th Street<br>New York, New York 10011 | 19th Street Associates, LLC<br>111 West 19th Street<br>New York, New York 10011 |

7340845

**EXHIBIT 4**
**Location of the Debtor's Substantial Assets, Books and Records,**
**and Assets Outside of the United States**

| Asset | Location | Value (if Outside U.S.) |
|---|---|---|
| Books and Records | 1441 Broadway<br>New York, New York 10018 | N/A |
| Inventory | 3 Mill Creek Drive<br>Secaucus, New Jersey 07094 | N/A |

7340845

## EXHIBIT 5
## Pending Litigation

1. *CIT Group Commercial Services, Inc. v. Occasion Brands LLC*, Superior Court of the State of Delaware, Case No. N20C-01-087 CLS: action for non-payment of goods sold and/or services rendered;

2. *GLS Collective, Inc. v. Occasion Brands, et al*, Superior Court of California, County of Los Angeles, Case No. 208TCV12552: action for (i) actual fraud, (ii) violation of California Business and Professions Code Section 17200, (iii) breach of contract, and (iv) goods had and received;

3. *Integrity Staffing Solutions, Inc. v. Occasion Brands, LLC*, Court of Common Pleas of the State of Delaware in and for New Castle County, Case No. CPU4-20-001541: action for non-payment on an account;

4. *Sherri Hill, Inc. v. Occasion Brands, LLC d/b/a PromGirl, Simply Dresses, and Kleinfeld*, United States District Court for the Western District of Texas, Case No. 1:20-cv-00139-LY: action for (i) suit on account, (ii) breach of contract, (iii) quantum meruit, (iv) unjust enrichment, (v) money had and received, (vi) promissory estoppel, (vii) trademark infringement, and (viii) common-law trademark infringement;

5. *Euler Hermes North America Insurance Company as assignee of Blush Group New York, LLC v. Occasion Brands, LLC dba Prom Girl*, Superior Court of Delaware, Case No. N20C-02-209-PRW: action for payment of past due invoices.

6. *American Clothing Express, Inc. v. Occasion Brands, LLC*, Chancery Court of Tennessee For the Thirtieth Judicial District at Memphis: action for foreclosure, breach of contract, and injunctive relief.

7340845

**EXHIBIT 6**
**Senior Management**

| Name | Title | Tenure With Debtor | Responsibilities/ Experience |
|---|---|---|---|
| Wilkenfeld, David | Chief Executive Officer | 22 years | Principal decision-maker for the Debtor |
| Collins, Kim | Chief Growth Officer | 17 years | Growth/Merchandising |
| Robert Nolan | Chief Restructuring Officer | N/A | Financial Advisory/Restructuring |

7340845